FILED

06/20/2022

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 3, 2021 Session

**AMY FROGGE, ET AL. V. SHAWN JOSEPH, ET AL.**

**Appeal from the Chancery Court for Davidson County**
**No. 20-420-III      Ellen Hobbs Lyle, Chancellor**

_____

**No. M2020-01422-COA-R3-CV**

_____

Three members of a school board filed this lawsuit after the school board passed a resolution approving a severance agreement with the director of schools that contained a non-disparagement clause preventing the individual school board members from expressing even truthful criticism of the director of schools. The plaintiff board members named as defendants the school board and the director of schools. They sought a declaratory judgment that the non-disparagement clause violated their free speech rights under the First and Fourteenth Amendments to the United States Constitution and Article I Section 19 of the Tennessee Constitution, was unconstitutionally overbroad, and was unenforceable as against the public policy of the State of Tennessee. They also sought a permanent injunction preventing enforcement of the non-disparagement clause and an award of their attorney fees and costs pursuant to 42 U.S.C. § 1988(b). The plaintiffs moved for summary judgment on numerous alternative grounds. The defendants filed motions to dismiss for failure to state a claim, lack of standing, and lack of ripeness. After a hearing, the trial court entered an order denying the defendants' motions to dismiss and granting the plaintiffs' motion for summary judgment. The trial court found that the non-disparagement clause was unenforceable and unconstitutional on several grounds. It permanently enjoined enforcement of the clause and awarded the plaintiffs their attorney fees. The defendants appeal, arguing that the case should have been dismissed for lack of standing and ripeness. We affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., joined. W. NEAL MCBRAYER, J., filed a concurring opinion.

J. Brooks Fox, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville & Davidson Co., Metropolitan Nashville Board of Public Education.

Charles W. Cagle and Katherine Kimmel, Nashville, Tennessee, for the appellant, Shawn Joseph.

Daniel A. Horwitz and Lindsay B. Smith, Nashville, Tennessee, for the appellees, Fran Bush, Jill Speering, and Amy Frogge.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

In 2016, the Metropolitan Nashville Board of Public Education ("the Board") entered into a contract of employment with Dr. Shawn Joseph, whereby Dr. Joseph would serve as Director of Schools for Metro Nashville for a term from 2016 until 2020.[1] During his tenure, Dr. Joseph's relationship with the Board and several of its elected members became tumultuous due to several instances of alleged misconduct and poor performance. Local news sources reported on the controversies, and the State of Tennessee recommended that Dr. Joseph's educator's license be suspended.

On April 9, 2019, a five-member majority of the Board voted to terminate Dr. Joseph's employment contract and approve the terms of a Severance Agreement with him. Each of the three plaintiffs in this case, Jill Speering, Fran Bush, and Amy Frogge, voted against approving the Severance Agreement. The Severance Agreement contained the following provisions that are relevant to this appeal:

> This Severance Agreement is entered into on this <u>17</u> day of April, 2019, by and between the Metropolitan Nashville Board of Public Education ("Board") and Dr. Shawn Joseph ("Dr. Joseph"). . . .
> . . .
> 1. <u>The Board's Agreement.</u>
> . . .
> f. . . .
>   (2) The Board will not make any disparaging or defamatory comments regarding Dr. Joseph and his performance as Director of Schools. This provision shall be effective for the Board collectively *and binding upon each Board member individually.* Dr. Joseph does not waive any right to institute litigation and seek damages against any Board member *in his/her individual capacity* who violates the terms and conditions [of] this Article of the

---

[1] Because the defendants filed motions to dismiss pursuant to Tennessee Rule of Civil Procedure 12.02(6) and argue on appeal that the trial court should have dismissed the case, the facts presented in this opinion are largely taken from the complaint.

agreement.

(emphasis added).  The Severance Agreement defined the term "Disparaging" as "a false and injurious statement that discredits or detracts from the reputation of another person." However, it separately defined "Defamatory" as "a statement or communication tending to harm a person's reputation by subjecting the person to public contempt, disgrace, or ridicule, or by adversely affecting the person's business."  Because the non-disparagement clause prohibited "any disparaging *or* defamatory comments," (emphasis added), and the definition of "defamatory" was not limited to false statements, it had the effect of prohibiting even truthful statements about Dr. Joseph if they tended to harm his reputation by subjecting him to "public contempt, disgrace, or ridicule" or "adversely" affecting his business.  Dr. Joseph likewise agreed not to make any disparaging or defamatory comments regarding Metro, the Board, or individual members of the Board.

On May 4, 2020, Ms. Frogge, Ms. Speering, and Ms. Bush ("Plaintiffs") filed this lawsuit individually and in their official capacities as Board members, naming as defendants Dr. Joseph and the Metropolitan Government of Nashville and Davidson County, acting by and through the Metropolitan Nashville Board of Public Education. Plaintiffs alleged that the Board had unlawfully censored even truthful criticism of Dr. Joseph under penalty of personal liability.  They claimed that the restriction prevented them, as elected officials, from speaking candidly and honestly with their constituents and with other elected officials about matters essential to their official duties.  Plaintiffs contended that the non-disparagement clause effected a prior restraint on their ability to make constitutionally protected comments regarding Dr. Joseph and his performance as Director of Schools.  They also asserted that the non-disparagement clause constituted a speaker-based and content-based restriction on speech.  Thus, Plaintiffs alleged that the non-disparagement clause violated their free speech rights under the First and Fourteenth Amendments to the United States Constitution and Article I Section 19 of the Tennessee Constitution.  Plaintiffs also asserted that the non-disparagement clause had forbidden a vast amount of constitutionally protected speech and was unconstitutionally overbroad. They further alleged that the non-disparagement clause was unenforceable because it contravened Tennessee public policy as expressed in Tennessee Code Annotated section 8-50-602 to the extent that it prohibited Plaintiffs from communicating with other elected public officials.[2]  They sought a declaratory judgment that the clause was unconstitutional and unenforceable pursuant to Tennessee Code Annotated section 29-14-101, et seq., and section 1-3-121, in addition to 42 U.S.C. § 1983.  Plaintiffs also sought a permanent injunction prohibiting enforcement of the non-disparagement clause and an award of their attorney fees pursuant to 42 U.S.C. § 1988(b).  They attached to their complaint the Severance Agreement and the minutes from the Board meeting during which Plaintiffs

---

[2] Tennessee Code Annotated section 8-50-602(a) is part of the Public Employee Political Freedom Act of 1980 ("PEPFA"), and provides, "No public employee shall be prohibited from communicating with an elected public official for any job-related purpose whatsoever."

voted against the resolution to accept the terms of the Severance Agreement.

Six weeks after the complaint was filed, neither defendant had filed an answer yet, but Plaintiffs filed a motion for summary judgment.[3] At the outset, Plaintiffs noted that the non-disparagement clause purported to be "binding upon each Board member individually," including Plaintiffs, even though they voted against adopting it. Thus, Plaintiffs maintained that their right to speak and express truthful criticism regarding Dr. Joseph had been unlawfully restrained by the Board under penalty of personal liability. Plaintiffs contended that because their speech had been restricted via a prior restraint, on the basis of its viewpoint, content, and the identity of the speaker, the restriction was presumptively unconstitutional such that the government would have the burden of proving the constitutionality of the restriction. Specifically, they argued that strict scrutiny would apply, so the government was required to demonstrate that the restriction on speech was narrowly tailed to serve a compelling state interest. Plaintiffs argued that Metro had no legitimate interest, much less a compelling one, in allowing censorship of political speech regarding government officials on matters of public importance. Even assuming that such an interest did exist, Plaintiffs argued that this restriction was not narrowly tailored. They also separately addressed the constitutionality of the restriction under the free speech protections of the Tennessee Constitution. Alternatively, Plaintiffs argued that the non-disparagement clause was unconstitutionally overbroad. They also asserted that the non-disparagement clause was void and unenforceable because it violates the public policy embodied in Tennessee Code Annotated section 8-50-602 or because it purported to strip them of legislative immunity. Alternatively, Plaintiffs asserted that the non-disparagement clause should be declared unenforceable against them individually because, although it purported to bind them individually, they did not assent to the contract. For all of these reasons, Plaintiffs sought summary judgment declaring that the clause was unenforceable and unconstitutional and a permanent injunction barring its enforcement.

On July 24, 2020, Metro filed a motion to dismiss pursuant to Tennessee Rule of Civil Procedure 12.02(6), asserting four grounds for dismissal: (1) lack of standing to challenge the Severance Agreement, (2) lack of ripeness, (3) failure to state a claim "under the First Amendment," and (4) failure to state a claim under the PEPFA. Metro filed a single memorandum which stated that it was both in support of its own motion to dismiss and in response to Plaintiffs' motion for summary judgment. First, regarding standing, Metro argued that a non-party to a contract has no standing to challenge the contract, and therefore, Plaintiffs did not have standing to challenge the Severance Agreement because

---

[3] Tennessee Rule of Civil Procedure 56.01 provides:

A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of thirty (30) days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

- 4 -

they were not parties to it. Metro noted that the contract itself stated that it was "by and between" the Board and Dr. Joseph. According to Metro, the non-disparagement clause "says nothing about the Plaintiffs' speech" and should be interpreted to apply only to "the Board." Thus, Metro contended that the First Amendment was not implicated because Plaintiffs' individual speech was not affected. In a footnote, Metro stated that Plaintiffs "cannot be individually liable under a contract to which they did not expressly agree."

Next, Metro argued that Plaintiffs' claims were speculative and not ripe for review. Because Plaintiffs were asserting a "pre-enforcement" challenge to the non-disparagement clause, Metro argued that they were required to show a credible fear of its enforcement against them. Metro argued that the probability of harm was not substantial or of sufficient immediacy to warrant a declaratory judgment. According to Metro, the complaint did not sufficiently allege that Plaintiffs intended to make any statements at all or that Dr. Joseph would attempt to enforce the clause against them individually if they did. Thus, Metro suggested that Plaintiffs could challenge the validity of the non-disparagement clause in the event that they actually made a statement and that Dr. Joseph decided to sue them, at which point, according to Metro, their claims would become ripe.

Metro also argued that the complaint failed to state a claim for a violation of the First Amendment for two reasons: (1) the restriction did not constitute a "prior restraint" on speech but a "subsequent punishment" after speech, and (2) there was no governmental interference with speech when the agreement threatened liability to a private individual rather than the government. Finally, Metro argued that the complaint failed to state a claim for a violation of the PEPFA. Aside from discussing these four bases for Metro's motion to dismiss, however, the memorandum did not otherwise respond to the issues analyzed in Plaintiffs' motion for summary judgment.

Plaintiffs filed a response to Metro's motion to dismiss, arguing that Metro's standing and ripeness arguments were both premised on an erroneous interpretation of the Severance Agreement that would go to the merits of the case rather than matters of standing and ripeness. Plaintiffs insisted that they had standing for several reasons. First, Plaintiffs claimed that they had standing to petition the court to construe a contractual provision that, by its plain terms, purported to be "binding upon each Board member individually" and to seek a declaration regarding the validity and constitutionality of the provision. According to Plaintiffs, Metro's argument that the non-disparagement clause did not affect Plaintiffs' speech strained the plain language of the Severance Agreement "beyond recognition." Plaintiffs said they "certainly agree[d] with Metro that they did not *assent* to be bound by the contract," (emphasis added), but Plaintiffs pointed out that this was "one of Plaintiffs' own pending merits arguments" due to the clear and unambiguous language to the contrary within the Severance Agreement itself. Plaintiffs also asserted that they had "statutory standing" to seek a declaratory judgment under the Declaratory Judgment Act, Tenn. Code Ann. § 29-14-101, et seq., or pursuant to Tennessee Code Annotated section 1-3-121. Plaintiffs also asserted that they had prudential standing due to the "myriad constitutional

injuries" arising from the non-disparagement clause.

Aside from the issue of standing, Plaintiffs also argued that their claims were ripe for review. Initially, they noted that this non-disparagement clause was not present in "a standard contract between private parties." Plaintiffs emphasized that they were elected officials subject to a government-imposed speech restriction due to the Board's status as a party to the Severance Agreement and its adoption of the Severance Agreement via legislative resolution. At the same time, Plaintiffs also noted that unlike the typical case where a plaintiff initiates a "pre-enforcement" challenge to a generally applicable statute, here, they sought a declaration regarding the validity of a contract that explicitly purported to bind them individually. Plaintiffs argued that the Severance Agreement itself integrated a specific and credible threat of enforcement against Plaintiffs, suggesting that they would be subject to claims for damages if they violated it. They noted that Dr. Joseph had not disclaimed any right to enforce the provision that he and Metro had recently negotiated and agreed upon. Plaintiffs contended that review was appropriate under Tennessee Code Annotated section 29-14-104, which states, "A contract may be construed either before or after there has been a breach thereof." Plaintiffs also asserted that they were forbidden from expressing even truthful criticism of a public figure and former government official, and therefore, their claims were ripe under the principles applicable to First Amendment cases. In response to Metro's argument that they did not sufficiently plead an intention or desire to make any statements, Plaintiffs quoted allegations from their complaint stating that the non-disparagement clause, among other things, "forbids the Plaintiffs—three duly elected officials who have a duty and obligation to their constituents—from speaking candidly and honestly with their constituents and with other elected officials" and "prohibits the Plaintiffs from reporting crime, cooperating with official investigations, providing truthful testimony, or making constitutionally protected statements in their official and individual capacities regarding matters of public concern."

Finally, Plaintiffs argued that their complaint sufficiently stated a claim for relief under "the First Amendment," to the extent that the issue was raised in Metro's motion to dismiss. However, Plaintiffs noted that their complaint had also asserted "multiple additional cognizable claims . . . nearly all of which Metro's motion ignores." Plaintiffs argued that Metro had waived any argument as to those alternative issues. Regarding the PEPFA, which Metro did mention, Plaintiffs clarified that they were not seeking to impose liability against Metro in the form of a claim under the PEPFA but merely to demonstrate that the non-disparagement clause violated the public policy expressed in the statute and should therefore be declared void. Plaintiffs noted that Metro had not submitted any evidentiary material in their attempt to contest Plaintiffs' standing, so there was "no evidence to rebut at this juncture." Anticipating that Metro might submit evidence at a later date, Plaintiffs attached an affidavit from Plaintiff Amy Frogge "[i]n the event that such evidence is presented" by Metro. Ms. Frogge stated that she was presently restricted from speaking and had refrained from doing so, but she described many of the "true statements" she would make to her constituents and others regarding Dr. Joseph and his

widely reported controversies if the non-disparagement clause was invalidated.

Dr. Joseph followed Metro's lead and likewise filed a response in opposition to Plaintiffs' motion for summary judgment along with a motion to dismiss pursuant to Rule 12.02(6) for lack of standing and ripeness. Dr. Joseph's motion to dismiss simply stated that he joined the motion to dismiss and the summary judgment response filed by Metro. His response to the motion for summary judgment raised an alternative argument that the non-disparagement clause was not subject to strict scrutiny or unconstitutional because Plaintiffs were public employees. Both Metro and Dr. Joseph responded to Plaintiffs' statement of undisputed material facts, admitting that all the facts listed by Plaintiffs were in fact undisputed.

Plaintiffs filed an additional response to Dr. Joseph's motion to dismiss but noted that Dr. Joseph raised no new grounds for dismissal. Plaintiffs also filed a "collective reply" to the defendants' responses to the motion for summary judgment. Plaintiffs reiterated the numerous alternative grounds on which they had based their summary judgment motion, including that the non-disparagement clause was a content-based, viewpoint-based, and speaker-based speech restriction that was presumptively unconstitutional and triggered strict scrutiny, and that it could not withstand such scrutiny because it did not further a compelling government interest and was not narrowly tailored. Plaintiffs noted they had also alleged that the clause was unconstitutionally overbroad, violated the Tennessee Constitution, and was unenforceable because it violated public policy, it unlawfully waived their legislative immunity, and Plaintiffs did not assent to be bound by it. Plaintiffs noted that neither Metro nor Dr. Joseph had argued that the non-disparagement clause furthered a compelling governmental interest or was narrowly tailored, nor did they introduce any evidence in response to the motion for summary judgment. As a result, Plaintiffs argued, if the trial court concluded that strict scrutiny applied to the constitutional claims, Metro had necessarily failed to meet its burden of proving that the non-disparagement clause satisfied strict scrutiny, and it must be invalidated accordingly. Plaintiffs further noted that neither defendant had addressed their claims regarding overbreadth, the Tennessee Constitution, or legislative immunity "in any regard." Plaintiffs noted that Metro even appeared to agree with their position that they did not assent to be bound by the non-disparagement clause.

Plaintiffs perceived only three limited arguments advanced by the defendants that might arguably prevent the application of strict scrutiny. First, Plaintiffs noted Metro's argument that there was no state action because the contract threatened private liability to Dr. Joseph, not the government. However, Plaintiffs noted that even Dr. Joseph had acknowledged within his response that the Severance Agreement was adopted by the Board in compliance with Tennessee statutes and "became an official action of the Board." Thus, Plaintiffs argued that "state action is present" because of the legislative resolution, in addition to the fact that the Board was a party to the very contract imposing the restriction. Next, Plaintiffs addressed Metro's argument that the language of the Severance Agreement

limited its application only to the Board and not to Plaintiffs individually. They noted that the non-disparagement clause plainly stated that it was "binding upon each Board member individually" and that Dr. Joseph did not waive any right "to institute litigation and seek damages against any Board member in his/her individual capacity who violates the terms and conditions [of] this Article of the agreement." As such, they claimed that it clearly affected their speech. Finally, Plaintiffs suggested that Dr. Joseph's argument regarding public employees was misplaced because they were elected officials, and in any event, strict scrutiny still applies when such speech restrictions are based on the speaker, content, or viewpoint. For all these reasons, Plaintiffs argued that there was no genuine dispute of material fact and that it was entitled to summary judgment declaring that the non-disparagement clause was unconstitutional, unenforceable, and violated public policy.

Less than 48 hours before the hearing on the motions, Metro and Dr. Joseph filed a "joint reply" in further support of their own motions to dismiss. It stated, "[B]oth parties to the contract (the Board and Dr. Joseph) agree that the provision should be interpreted to limit only the speech of the School Board itself (or those speaking on behalf of the Board), not that of individual Board members." The joint reply stated, "If there was a question previously, Plaintiffs now have their answer: both the Board and Dr. Joseph (the parties to the contract) have disavowed any interpretation of the severance agreement that would prevent the Plaintiffs from speaking freely, either as individual board members or as individual citizens." According to the defendants, under those circumstances, "Plaintiffs cannot demonstrate a 'cognizable injury' sufficient enough to convey standing and imminent enough to establish ripeness." They maintained that Plaintiffs were "nonparties to the Severance Agreement" and therefore had no cognizable injury that would give them standing to challenge the contract or a ripe claim to pursue. They suggested that "Plaintiffs are free to make any statement they wish about Dr. Joseph because the contract provision only prohibits statements by the School Board itself."[4]

After a hearing, the trial court entered an order denying the defendants' motions to dismiss and granting Plaintiffs' motion for summary judgment on the basis that there was no material dispute that the non-disparagement clause "does not promote a compelling governmental interest, that it is unconstitutional, and that it is an overbroad and unenforceable speech restriction." After reciting the undisputed facts, the court set out the numerous specific bases on which Plaintiffs had sought summary judgment. The trial court explained that in the First Amendment context, when the government restricts speech based on its content and the viewpoint expressed, the restriction is presumptively unconstitutional and may be justified only if the government proves that the restriction is narrowly tailored to serve compelling state interests. Thus, the court concluded that Plaintiffs could meet

---

[4] In response, Plaintiffs submitted a news report from a local television station regarding the Severance Agreement and its non-disparagement clause. According to the news report, Metro's Law Director who negotiated the Severance Agreement said he "could not say" whether individual board members could actually be sued under the contract because his office had never dealt with that legal issue, but he added, "That was something that Dr. Joseph wanted in the agreement."

their summary judgment burden in this case if they could affirmatively negate an essential element of the nonmoving party's claim, by demonstrating beyond material dispute that the non-disparagement clause was not narrowly tailored to further a compelling governmental interest. Also, the court explained that Plaintiffs would be entitled to summary judgment on their overbreadth claim if they could demonstrate beyond material dispute that a substantial number of the applications of the non-disparagement clause were unconstitutional in relation to its plainly legitimate sweep.

The court noted that Metro opposed the motion for summary judgment and simultaneously moved to dismiss on the grounds that the wording of the Severance Agreement only restricted the speech of the Board, Plaintiffs lacked standing and their claims were not ripe, and the complaint failed to state a claim under the First Amendment or the PEPFA. Initially, the trial court rejected Metro's argument that there was no state action because it was undisputed that the non-disparagement clause was adopted by a formal School Board Resolution, and additionally, the Board itself was a party to the contract containing the speech restriction. As for the wording of the non-disparagement clause, the trial court again rejected Metro's argument, finding the text "clearly states without ambiguity" that it was "binding upon each Board member" and not merely to the Board as a collective body. The court noted that the clause further referenced Dr. Joseph's right to institute litigation and seek damages against any board member "in his/her individual capacity" should they violate the terms of the agreement. Given this unambiguous language, the court concluded that Metro's proposed interpretation "would make no sense." The court noted that it could not make a new contract for parties who had spoken for themselves. With specific reference to the matter of standing, the court noted Metro's argument that Plaintiffs were not parties to the contract, so they could not maintain their claims. However, the trial court rejected this argument "because the contract that they are challenging expressly states that it binds them, and it still affects them and purports to subject them to individual damages liability." It reasoned that the defendants' "joint collusion to prevent even truthful criticism of one another," while asserting that no one had standing to challenge it, was "insufficient to eliminate the existence of a constitutional injury" and did not preclude judicial review of the censorship. It found that the contract "unambiguously applies to the Plaintiffs" and that the matter was "fully justiciable." Finally, the trial court rejected Dr. Joseph's argument regarding public employees.

Having rejected the defendants' only arguments in opposition to the application of strict scrutiny, the court concluded that the non-disparagement clause restricted Plaintiffs' speech on the basis of its viewpoint, content, and speaker, so strict scrutiny applied with the government bearing the burden of proving the constitutionality of its restriction. The court found that strict scrutiny would also apply under the Tennessee Constitution. The court found that neither defendant had offered any explanation as to how an elected governmental body could lawfully contract away its legislative authority or latitude to express its views as part of an employee severance agreement. It noted that neither defendant even argued that the non-disparagement clause furthered a compelling

- 9 -

government interest or that it was narrowly tailored, nor did they introduce any evidence in response to the motion for summary judgment. As a result, the court concluded that Metro failed to meet its burden of proving that the non-disparagement clause satisfied strict scrutiny, and it must be invalidated.

The trial court also noted that neither defendant addressed Plaintiffs' arguments regarding overbreadth, the Tennessee Constitution, or legislative immunity, and the non-disparagement clause was therefore "invalidated on each of these grounds" as well. Regarding Plaintiffs' mutual assent argument, the trial court agreed that "Plaintiffs did not assent to be bound" by the non-disparagement clause, so it "cannot lawfully be enforced against them or subject them to damages in any regard." Regarding the PEPFA, the trial court noted that both defendants perceived the claim to be in the nature of a cause of action for damages when Plaintiffs had already clarified that the PEPFA was actually a component of their much broader claim for declaratory relief that the non-disparagement clause violated public policy. The court found that neither defendant explained how the non-disparagement clause could be compatible with the public policy set forth in the PEPFA regarding communication with public officials.

In summary, at the conclusion of the 27-page order, the trial court declared the non-disparagement clause unconstitutional, permanently enjoined its enforcement, granted Plaintiffs' motion for summary judgment and denied the defendants' motions to dismiss. The trial court ruled that Plaintiffs were entitled to recover their attorney fees and costs pursuant to 42 U.S.C. § 1988 and directed them to file an application for fees. Both Metro and Dr. Joseph prematurely filed notices of appeal to this Court prior to the final award of attorney fees. The trial court ultimately entered its final order awarding attorney fees on November 25, 2020.

## II. ISSUES PRESENTED

The parties raise numerous issues on appeal. Because Metro's statement of the issues is somewhat difficult to follow, we quote it directly from Metro's brief:

### STATEMENT OF THE ISSUES

The Severance Agreement at-issue was entered into between the School Board and then-director of schools, Dr. Joseph. Plaintiffs (all board members at the time) voted against it, did not sign it, and were not parties to the contract. Accordingly, the Agreement did not bind the Plaintiffs. Further, the Board and Dr. Joseph (the only parties to the contract) have explained that it was never their intent to interfere with Plaintiffs' free speech rights. Thus, Plaintiffs do not have a concrete and particularized injury-in-fact. There was never any prohibition of Plaintiffs' speech, or any enforcement (or even threatened enforcement) of the Agreement's nondisparagement

clause.

Therefore, because Plaintiffs' allegations are insufficient to show an injury-in-fact, redressability, or ripeness, Plaintiffs do not have standing (whether under federal or state law) to sue over a contract to which they were not parties. Finally, Plaintiffs have failed to allege any attempt to speak with a public official, or any related discrimination on the part of the Metropolitan Government which would give rise to a claim under TENN. CODE ANN. § 8-50-602(a).

Did the Trial Court err by not dismissing this case?

Dr. Joseph presents two issues for review on appeal, which we also quote from his brief:

I.      Whether Plaintiffs may prevail on a motion for summary judgement in a §1983 action without establishing that they suffered an injury in fact or that their claims can be redressed by the requested relief.

II.     Whether qualified immunity should be extended to a former government employee in a suit initiated by his former employers to effectuate the policy rationale underpinning the doctrine of qualified immunity.

Finally, in their posture as appellees, Plaintiffs present the following issues on appeal:

(1)     Whether the trial court correctly determined that the Plaintiffs had prudential, statutory, and/or individualized standing to maintain their claims.
(2)     Whether the Defendants' failure to raise an argument on appeal regarding the trial court's rulings that the Plaintiffs had prudential standing to maintain their facial overbreadth claim and statutory standing to seek a declaration forecloses the Defendants' claims regarding the Plaintiffs' individualized standing.
(3)     Whether the trial court correctly determined that the Plaintiffs had individualized standing to maintain their claims.
(4)     Whether the trial court abused its "wide" discretion to issue a declaration regarding the constitutionality of the legislatively ratified School Board Censorship Clause in Joseph's severance agreement.
(5)     Whether the Defendants' failure to appeal three grounds upon which the trial court invalidated the School Board Censorship Clause forecloses the Defendants' merits arguments.
(6)     Whether Joseph's merits arguments are waived because they are presented for the first time on appeal.
(7)     Whether the trial court erred in declaring the School Board Censorship Clause unconstitutional and illegal due to its facial

- 11 -

overbreadth; its content-, viewpoint-, and speaker-based speech restrictions; its contravention of article I, § 19 of the Tennessee Constitution; or its violations of Tennessee public policy.

(8) Whether either Defendant appealed the trial court's November 25, 2020 order on attorney's fees.

(9) Whether Metro may adopt Joseph's argument regarding the trial court's November 25, 2020 order on attorney's fees when Joseph's position cannot apply to Metro.

(10) Whether Joseph's claim regarding the trial court's November 25, 2020 order on attorney's fees is waived because he failed to advance it below and took a conflicting position before the trial court.

(11) Whether the allegations in the Plaintiffs' Complaint are admitted due to the Defendants' failure to deny them in a responsive pleading.

(12) Whether the Plaintiffs should recover their attorney's fees regarding this appeal.

For the following reasons, we affirm the decision of the chancery court and remand for further proceedings.

## III.   DISCUSSION

### A.   *Defining the Issues on Appeal*

We begin by noting the lack of clarity in Metro's statement of the issues. This Court emphasized the importance of clearly defining issues presented for review on appeal in *Cartwright v. Jackson Capital Partners, L.P.*, 478 S.W.3d 596, 613-15 (Tenn. Ct. App. 2015), in which we explained:

> At the outset, it is necessary to identify the issues properly presented for our review in order to define the scope of our review on appeal. "'Scope of review'" defines the issues that may be reviewed by an appellate court when an order or judgment has been properly appealed. *Hodge v. Craig*, 382 S.W.3d 325, 333 n.2 (Tenn.2012). The scope of our review depends largely on whether issues have been properly raised on appeal and presented in the manner prescribed by Tennessee Rule of Appellate Procedure 27. *Id*. at 333-34. Appellants must include in their brief "a statement of the issues they desire to present to the court and an argument with respect to each of the issues presented." *Id*. at 334-35 (footnote omitted); *see* Tenn. R. App. P. 27(a)(4) (providing that briefs must contain a "statement of the issues presented for review"). "The requirement of a statement of the issues raised on appeal is no mere technicality." *Owen v. Long Tire, LLC*, No. W2011-01227-COA-R3-CV, 2011 WL 6777014, at *4 (Tenn. Ct. App. Dec. 22, 2011). In *Hodge*, the Tennessee Supreme Court emphasized the importance

- 12 -

of properly presenting issues for review and indicated that "a properly framed issue may be the most important part of an appellate brief." *Id*. at 334 (citing Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 83 (2008); David E. Sorkin, *Make Issue Statements Work for You*, 83 Ill. B.J. 39, 39 (Jan. 1995)). "Rather than searching for hidden questions, appellate courts prefer to know immediately what questions they are supposed to answer." *Id*. (citing Bryan A. Garner, *Garner on Language & Writing* 115 (2009); Robert L. Stern, *Appellate Practice in the United States* § 10.9, at 263 (2d ed. 1989)). "The issues should be framed as specifically as the nature of the error will permit in order to avoid any potential risk of waiver." *Id*. at 335 (citing *Fahey v. Eldridge*, 46 S.W.3d 138, 143-44 (Tenn. 2001); *State v. Williams*, 914 S.W.2d 940, 948 (Tenn. Crim. App. 1995)). "Parties should refrain from incorporating several separate and distinct errors into a single issue." *Williams*, 914 S.W.2d at 948-49 (finding an issue waived because it was "too broad in scope" and "vague and conclusory in nature"). Instead, "[a] separate issue should be presented for each error raised in the appellate court." *Id*. at 948 (citing *Leeson v. Chernau*, 734 S.W.2d 634, 637 (Tenn. Ct. App. 1987)). The Rules of Appellate Procedure "'do[ ] not contemplate that an appellant may submit one blanket issue as to the correctness of the judgment and thereby open the door to argument upon various issues which might affect the correctness of the judgment.'" *Id*. at 948 n.5 (quoting *Leeson*, 734 S.W.2d at 637).

"[P]roperly drafted issues will assist the writer of the appellant's brief, the writer of the appellee's brief, the panel of appellate judges who are assigned the responsibility of addressing the issues in an opinion, and the staff of each appellate judge." *Williams*, 914 S.W.2d at 948. If an issue is not properly drafted, "[t]he attorney preparing the appellee's brief will entertain doubt as to the precise issue that is to be addressed[.]" *Id.* The appellee is entitled to fair notice of the appellate issues so as to prepare his or her response, and, more importantly, "this Court is not charged with the responsibility of scouring the appellate record for any reversible error the trial court may have committed." *Owen*, 2011 WL 6777014, at *4. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). "The adversarial system of justice is premised on the idea that 'appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.'" *Malmquist v. Malmquist*, No. W2007-02373-COA-R3-CV, 2011 WL 1087206, at *11 n. 21 (Tenn. Ct. App. Mar. 25, 2011) (quoting *State v. Northern*, 262 S.W.3d 741, 767 (Tenn. 2008) (Holder, J., concurring in part and dissenting in part)). Thus, "appellate

courts may properly decline to consider issues that have not been raised and briefed in accordance with the applicable rules." *Waters v. Farr*, 291 S.W.3d 873, 919 (Tenn. 2009).

. . .

"'Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals.'" *Bunch v. Bunch*, 281 S.W.3d 406, 410 (Tenn. Ct. App. 2008) (quoting *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001)).

With these principles in mind, we return to Metro's statement of issues, which bears repeating:

## STATEMENT OF THE ISSUES

The Severance Agreement at-issue was entered into between the School Board and then-director of schools, Dr. Joseph. Plaintiffs (all board members at the time) voted against it, did not sign it, and were not parties to the contract. Accordingly, the Agreement did not bind the Plaintiffs. Further, the Board and Dr. Joseph (the only parties to the contract) have explained that it was never their intent to interfere with Plaintiffs' free speech rights. Thus, Plaintiffs do not have a concrete and particularized injury-in-fact. There was never any prohibition of Plaintiffs' speech, or any enforcement (or even threatened enforcement) of the Agreement's nondisparagement clause.

Therefore, because Plaintiffs' allegations are insufficient to show an injury-in-fact, redressability, or ripeness, Plaintiffs do not have standing (whether under federal or state law) to sue over a contract to which they were not parties. Finally, Plaintiffs have failed to allege any attempt to speak with a public official, or any related discrimination on the part of the Metropolitan Government which would give rise to a claim under TENN. CODE ANN. § 8-50-602(a).

Did the Trial Court err by not dismissing this case?

We interpret this section as fairly raising the following issues: (1) Did the trial court err by not dismissing this case for lack of standing or ripeness; and (2) Did the trial court err by not dismissing this case for failure to state a claim under the PEPFA. To the extent that Metro analyzes any other issues within the body of its brief on appeal, we deem them waived. "Our supreme court has clearly stated that 'an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)." *Cartwright*, 478 S.W.3d at 616 (quoting *Hodge*, 382 S.W.3d at 335). We

also note that Dr. Joseph's only issue on appeal (aside from one regarding attorney fees)[5] is: "Whether Plaintiffs may prevail on a motion for summary judgement in a §1983 action without establishing that they suffered an injury in fact or that their claims can be redressed by the requested relief." Thus, any issues argued in his brief beyond these are likewise waived.[6] *See id.*

## B.    Standing & Ripeness

We now turn to Metro's contention that the trial court should have dismissed this case for lack of standing and ripeness. Dr. Joseph likewise argues that Plaintiffs failed to establish "an injury in fact or that their claims can be redressed by the requested relief" in order to have standing. Before we can resolve those issues, however, we must first consider the defendants' related argument regarding the basic interpretation of the non-disparagement clause. Metro argues that "[c]ourts must read contract provisions in a manner that preserves them as lawful and reasonable" and that "every effort should be made to preserve Plaintiffs' free speech rights." However, we agree with the trial court that the only reasonable construction of the Severance Agreement is that its non-disparagement clause purports to be, as it says, "binding upon each Board member individually." Its language is unambiguous. "[T]his Court cannot rewrite the parties' contract because its terms later prove to be burdensome." *Baptist Mem'l Hosp. v. Argo Const. Corp*., 308 S.W.3d 337, 345 (Tenn. Ct. App. 2009). Thus, our consideration of the remaining issues will be based on this interpretation of the operative language.

"To determine whether a particular case involves a legal controversy, Tennessee courts use justiciability doctrines that 'mirror the justiciability doctrines employed by the

---

[5] Although Dr. Joseph framed his second issue broadly, the argument section of his brief directs this issue toward the award of attorney fees.

[6] As a result of the limited issues presented by the defendants in the trial court and on appeal regarding grounds for dismissal, we note that if these limited issues are resolved in Plaintiffs' favor on appeal, the decision of the trial court will be affirmed without reaching the host of substantive issues raised in Plaintiffs' motion for summary judgment. The concurring opinion suggests that because this is an appeal from the chancery court's grant of summary judgment, the scope of our review is too narrow. However, when reviewing a decision on summary judgment, this Court is not required to extend our review to issues that have been waived. *See, e.g*, *Davis v. McGuigan*, 325 S.W.3d 149, 154 (Tenn. 2010) ("In his brief, Mr. McGuigan contends that there is no genuine issue of material fact as to any of the six elements. Before the trial court, however, he argued that summary judgment was warranted only on the first, fourth, fifth, and sixth elements. We therefore consider Mr. McGuigan's arguments regarding the second and third elements to be waived."); *Dye v. Witco Corp*., 216 S.W.3d 317, 321 (Tenn. 2007) ("These arguments were not raised in opposition to Witco's motion for summary judgment and are not mentioned in the trial court record. . . . Because Dye raises this issue for the first time on appeal, we conclude that the issue is waived."); *E & J Const. Co. v. Liberty Bldg. Sys., Inc*., No. E2009-01403-COA-R3-CV, 2010 WL 3385134, at *7 (Tenn. Ct. App. Aug. 27, 2010) ("Because Plaintiff has failed to cite any authority whatsoever with respect to its argument that the Trial Court improperly granted Defendant's motion for partial summary judgment as to the various claims at issue in that motion, we find that Plaintiff has waived these issues on appeal. Accordingly, we affirm the Trial Court's grant of partial summary judgment to Defendant.").

United States Supreme Court and the federal courts,'" including the doctrines of standing and ripeness. *West v. Schofield*, 468 S.W.3d 482, 490 (Tenn. 2015) (quoting *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 202 (Tenn. 2009)). "'Lack of standing may be raised as a defense in a Tennessee Rule of Civil Procedure 12.02(6) motion to dismiss.'" *Lovett v. Lynch*, No. M2016-00680-COA-R3-CV, 2016 WL 7166407, at *4 (Tenn. Ct. App. Dec. 8, 2016) (quoting *Dubis v. Loyd*, No. W2015-02192-COA-R3-CV, 2016 WL 4371786, at *3 (Tenn. Ct. App. Aug. 15, 2016)). The same is true for lack of ripeness. *See West*, 468 S.W.3d at 489, 494-95 (reversing a trial court's denial of a Rule 12.02(6) motion to dismiss upon concluding that the claims were unripe). "Such a motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence." *Id.* at 489 (citing *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011)). Thus, the court decides the motion "by examining the pleadings alone." *Id.* The motion "'admits the truth of all of the relevant and material allegations contained in the complaint, but . . . asserts that the allegations fail to establish a cause of action.'" *Id.* (quoting *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 854 (Tenn. 2010)). We must "'construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences.'" *Id.* (quoting *Webb*, 346 S.W.3d at 427).

The doctrine of ripeness "requires a court to answer the question of 'whether the dispute has matured to the point that it warrants a judicial decision.'" *Id.* at 490 (quoting *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 848 (Tenn. 2010)). It is "peculiarly a question of timing." *Id.* (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974)). "'The central concern of the ripeness doctrine is whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all.'" *Id.* at 491 (quoting *B & B Enters.*, 318 S.W.3d at 848). In the ripeness analysis, courts typically consider "'[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

"Courts use the doctrine of standing to determine whether a litigant is entitled to pursue judicial relief as to a particular issue or cause of action." *City of Memphis v. Hargett*, 414 S.W.3d 88, 97 (Tenn. 2013) (citing *ACLU of Tenn. v. Darnell*, 195 S.W.3d 612, 619 (Tenn. 2006); *Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976)). The standing inquiry "requires a 'careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.'" *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)). Standing focuses on "'a party's right to bring a cause of action, and the likelihood of success on the merits does not factor into such an inquiry.'" *Fisher v. Hargett*, 604 S.W.3d 381, 396 (Tenn. 2020) (quoting *City of Memphis*, 414 S.W.3d at 96). However, "a party's standing may turn on the nature of the claim and requires a determination of whether a plaintiff is entitled to an adjudication of the particular claim." *Id.* In order to establish constitutional

standing,[7] the plaintiff must demonstrate three elements:

> 1) a distinct and palpable injury; that is, an injury that is not conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general public; 2) a causal connection between the alleged injury and the challenged conduct; and 3) the injury must be capable of being redressed by a favorable decision of the court.

*Id.* A party seeking a declaratory judgment need not show a *present* injury, but an actual "case" or "controversy" or "bona fide disagreement" must exist. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 837-38 (Tenn. 2008). In that sense, "the declaratory judgment action recognizes that '[c]ourts should operate as preventive clinics as well as hospitals for the injured.'" *Id.* at 836-37 (quoting Henry R. Gibson, *Gibson's Suits in Chancery*, § 545 (6th ed. 1982)).

"'The standing question thus bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention[.]'" *ACLU of Tenn.*, 195 S.W.3d at 620 n.7 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)). "In some cases, moreover, the question of standing and ripeness 'boil down to the same question.'" *Howe v. Haslam*, No. M2013-01790-COA-R3-CV, 2014 WL 5698877, at *7 (Tenn. Ct. App. Nov. 4, 2014) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014)).

When courts consider a "pre-enforcement" challenge to the constitutionality of a statute or law, "a plaintiff may satisfy the injury element by (1) alleging 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute' and (2) showing the existence of 'a credible threat of prosecution thereunder.'" *Tennesseans for Sensible Election Laws*, 2021 WL 4621249, at *3 (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). Thus,

---

[7] We recognize Plaintiffs' argument on appeal that this Court could have affirmed the trial court outright based on the overbreadth claim alone. Plaintiffs correctly note that neither defendant raised any issue on appeal regarding the overbreadth claim specifically. Plaintiffs suggest that their overbreadth claim is subject to a separate and different standing analysis, and therefore, the defendants' general arguments regarding lack of standing would not constitute a ground for reversal of their overbreadth claim. We disagree. "'[U]nder no circumstances ... does the overbreadth doctrine relieve a plaintiff of its burden to show constitutional standing." *Tennesseans for Sensible Election Laws v. Slatery*, No. M2020-01292-COA-R3-CV, 2021 WL 4621249, at *7 (Tenn. Ct. App. Oct. 7, 2021) (quoting *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 799 (8th Cir. 2006)); *see also Birmingham v. Nessel*, No. 21-1297, 2021 WL 5712150, at *3 (6th Cir. Dec. 2, 2021) (noting that the overbreadth doctrine provides "an exception to only prudential standing requirements, not constitutional standing requirements"). Plaintiffs raised similar alternative arguments regarding "statutory standing." Again, however, statutory standing is a type of "non-constitutional" or "prudential" standing, and it "does not replace constitutional standing." *Tennesseans for Sensible Election Laws*, 2021 WL 4621249, at *4 n.7. As such, it was necessary to address the defendants' arguments regarding constitutional standing.

- 17 -

when an individual is subject to "threatened enforcement" of a law or restriction, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List*, 573 U.S. at 158. Instead, pre-enforcement review is permitted "under circumstances that render the threatened enforcement sufficiently imminent." *Id.* at 159. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Id.* at 158 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

The case before us involves a pre-enforcement challenge primarily on the basis of the First Amendment. "[I]n a pre-enforcement review case under the First Amendment (like this one), courts do not closely scrutinize the plaintiff's complaint for standing when the plaintiff 'claims an interest in engaging in protected speech that implicates, if not violates, each [provision of the law at issue].'" *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 451 (6th Cir. 2014) (quoting *Carey v. Wolnitzek*, 614 F.3d 189, 196 (6th Cir. 2010)). If the plaintiff can "objectively establish an imminent threat that chills protected activity," a cognizable injury-in-fact exists. *Faith Baptist Church v. Waterford Twp.*, 522 F.App'x 322, 330 (6th Cir. 2013) (quoting *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832, 834 (6th Cir. 2001)). "'A plaintiff meets the injury-in-fact requirement—and the case is ripe—when the threat of enforcement of that law is sufficiently imminent.'" *Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 506 (6th Cir. 2017) (quoting *Platt*, 769 F.3d at 451). Thus, the doctrines of ripeness and standing "may be analyzed together" in this context. *Platt*, 769 F.3d at 451; *see also Miller*, 852 F.3d at 506 ("In the pre-enforcement First Amendment context, the line between Article III standing and ripeness has evaporated.") (internal quotation omitted). "Whether the plaintiffs have standing and whether their claims are ripe come to the same question: Have they established a credible threat of enforcement?" *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016).

Applying these principles to the case at bar, the first requirement for a pre-enforcement challenge is that the plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute." *Tennesseans for Sensible Election Laws*, 2021 WL 4621249, at *3 (quoting *Babbitt*, 442 U.S. at 298). Regarding this issue, Dr. Joseph argues on appeal that "[n]owhere in the record do the Plaintiffs claim to have expressed a desire or intention to speak publicly about Dr. Joseph's employment with Metro." Because the trial court considered the issue of standing within the context of the defendants' Rule 12.02(6) motions to dismiss, we will not consider Ms. Frogge's affidavit that appears to have been conditionally submitted "[i]n the event" that Metro introduced evidentiary material. Rather, we will look to the allegations of Plaintiffs' complaint. In doing so, we conclude that the complaint itself sufficiently alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [Metro]." *See id.* The complaint alleged that the School Board, in the midst of controversies, voted "to censor – under penalty of personal liability – the Plaintiffs' truthful criticism of [Dr. Joseph]." It alleged that there were

- 18 -

several instances of alleged misconduct during Dr. Joseph's tenure and noted local news reports detailing "alleged mishandling of sexual harassment claims, finding of low employee morale and pay disparities after outside legal counsel was hired to investigate, allegations involving no-bid contracts, and changes in student discipline policy that left teachers with fewer tools to manage their classrooms." It alleged that Dr. Joseph's failure to report instances of teacher misconduct led the State of Tennessee to recommend suspension of his educator's license. The complaint alleged that Plaintiffs voted against the Severance Agreement containing the non-disparagement clause, which "purported to censor and prevent . . . Plaintiffs – all public officials with roles that carry significant public interest – from disparaging" Dr. Joseph or making truthful statements if they would tend to harm his reputation by subjecting him to public contempt, disgrace, or ridicule, or adversely affect his business. They alleged that the non-disparagement clause effected a prior restraint on their "right and ability to make a vast number of constitutionally protected comments regarding Dr. Joseph and his performance as Director of Schools." They alleged that it "forbids the Plaintiffs—three duly elected officials who have a duty and obligation to their constituents—from speaking candidly and honestly with their constituents and with other elected officials, including one another, about matters essential to their offices and their official duties." They alleged that it "prohibits the Plaintiffs from reporting crime, cooperating with official investigations, providing truthful testimony, or making constitutionally protected statements in their official and individual capacities regarding matters of public concern." Thus, we find no support for Dr. Joseph's assertion that Plaintiffs never expressed "a desire or intention to speak publicly about Dr. Joseph's employment with Metro." To the contrary, they alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by" Metro's legislatively-approved contract, meeting the first element for a pre-enforcement challenge. *See id.*

The next element is whether a "credible threat" of prosecution or enforcement exists. *Id.* The defendants argue that there is no credible threat of enforcement. The Sixth Circuit has set forth several factors to consider in determining whether a "credible threat" of prosecution exists. *Tennesseans for Sensible Election Laws*, 2021 WL 4621249, at *3 (citing *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021)). Those include: (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their conduct specifically; (3) an attribute of the challenged statute or policy that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action; and (4) a defendant's refusal to disavow enforcement of the statute against a particular plaintiff. *Id.* (citing *Online Merchants Guild*, 995 F.3d at 550). However, it is important to note that these factors "are not exhaustive, nor must each be established." *Online Merchants Guild*, 995 F.3d at 550.

At first glance, the first factor – history of past *enforcement* – does not appear particularly helpful. *See, e.g.*, *Online Merchants Guild*, 995 F.3d at 550 (concluding that

this factor carried "little weight" where the law was "enforceable only during a declared emergency" and it "ma[de] sense that there would be at best limited evidence of a history of enforcement"). The non-disparagement clause had been only recently approved by a majority of the Board, and Plaintiffs, as the only three Board members who voted against it, are the only three individuals likely to be targets of its enforcement. Thus, there have been no prior "enforcement" actions against Plaintiffs (or others) to date. However, this is not a prerequisite for standing. *See Susan B. Anthony List*, 573 U.S. at 158 ("an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law"); *Daly v. McGuffey*, No. 21-3266, 2021 WL 7543815, at \*3 (6th Cir. Nov. 15, 2021) ("plaintiffs are not required to show a history of past enforcement for the same conduct"). Aside from any history of *enforcement*, however, we conclude that the history and circumstances surrounding the very *adoption* of the Severance Agreement are relevant. *See Minn. Democratic-Farmer-Lab. Party by Martin v. Simon*, 970 N.W.2d 689, 696-97 (Minn. Ct. App. 2022) ("[F]ederal courts have considered the history of the statute's enforcement, as well as how recently it was enacted."); *see, e.g.*, *St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) ("[T]he threat of prosecution is greater under a statute enacted relatively recently."). Again, the stated factors above are not exhaustive. This is not a typical case where Plaintiffs are attempting a "pre-enforcement" challenge to a longstanding rule or statute that may or may not have been enforced throughout its history. *See, e.g.*, *Plunderbund Media, LLC, v. Dewine*, 753 F. App'x 362, 365-72 (6th Cir. 2018) (considering a history of enforcement or lack of enforcement of a statute that had "been in effect for decades"). This case involves a Severance Agreement only recently negotiated by Dr. Joseph and the Board and then legislatively adopted by the Board. It is reasonable to conclude that Dr. Joseph and the Board approved the Severance Agreement, over Plaintiffs' objection, with the expectation and intention that it would be enforced against them. Thus, the history of this restriction supports a finding that there is a credible threat of its enforcement.

The second factor is whether "enforcement warning letters" have been sent to the plaintiffs "regarding their specific conduct." *Online Merchants Guild*, 995 F.3d at 550. Again, the nature of the restriction at issue in this case somewhat limits the applicability of this factor as stated. However, the Sixth Circuit "has held there to be standing for a pre-enforcement challenge without any warning letter or similar specific correspondence whatsoever." *Id*. (citing *Platt*, 769 F.3d at 452). Furthermore, as Plaintiffs noted before the trial court, the non-disparagement clause itself contains a specific "threat" of future enforcement directly against Plaintiffs. The Board not only agreed that the clause would be "binding upon each Board member individually" but also suggested that Dr. Joseph would have the "right to institute litigation and seek damages against any Board member in his/her individual capacity who violates the terms and conditions [of] this Article of the agreement." Thus, in our view, the Severance Agreement itself served as a "de facto" warning letter that Plaintiffs' specific conduct would be subject to punishment. *See, e.g.*, *Miller*, 852 F.3d at 506 (noting that a denial of a license to plaintiffs "would have acted as a de facto 'warning letter' that plaintiffs' conduct was potentially subject to prosecution");

*see also McKay v. Federspiel*, 823 F.3d 862, 867-70 (6th Cir. 2016) (noting that posted warning signs addressed to the general public "do not give rise to the same level of threatened enforcement" as letters addressing the plaintiff or his conduct specifically). This factor also suggests that there is a credible threat or fear of enforcement.

The third factor is whether the challenged policy has an attribute "that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." *Online Merchants Guild*, 995 F.3d at 550. "A statute is more likely to trigger a credible fear of prosecution if it contains a feature making enforcement of the statute easier or more likely," such as "a citizen-enforcement provision authorizing a member of the public to file complaints." *Plunderbund Media*, 753 F. App'x 362, 370-71; *see, e.g.*, *Online Merchants Guild*, 995 F.3d at 551 ("[P]rivate plaintiffs may bring a damages action to remedy price-gouging violations, which increases the likelihood that Guild members will have to defend against price-gouging suits.").[8]  Here, the Severance Agreement contemplates that Dr. Joseph could easily bring an enforcement action by instituting litigation and seeking damages against an individual Board member in his or her individual capacity.  We also note that the Severance Agreement broadly prohibits "any disparaging *or* defamatory comments," (emphasis added), and with the definition of "defamatory" not being limited to false statements, it effectively prohibits even truthful statements about Dr. Joseph if they tend to harm his reputation by subjecting him to "public contempt, disgrace, or ridicule" or "adversely" affecting his business. In our view, this is a particular feature or attribute of the Severance Agreement that makes an enforcement action by Dr. Joseph "easier or more likely." Thus, we conclude that this factor also weighs in favor of a finding that the threat of an enforcement action is credible.

The final factor is whether a defendant has refused to disavow enforcement of the statute against a particular plaintiff. *Id.* at 550.  We recognize that Dr. Joseph and Metro filed a "joint reply" just before the hearing stating that they "agree that the provision should be interpreted to limit only the speech of the School Board itself (or those speaking on behalf of the Board), not that of individual Board members" and now "disavow[] any interpretation of the severance agreement that would prevent the Plaintiffs from speaking freely, either as individual board members or as individual citizens."  According to the defendants, this means that Plaintiffs cannot establish standing.  We disagree.  Notably, the statements of counsel in the joint reply were not supported by any affidavits, nor did they alter the terms of the Severance Agreement legislatively adopted by the Board.  This Court is tasked with deciding the issue of standing based on the allegations in the complaint.  As such, the statements in the joint reply do not alter our conclusion.  Moreover, "[a] defendant may not eliminate standing at will by ceasing to enforce a statute whenever it pleases." *Faith Baptist Church*, 522 F. App'x at 331 (noting that dismissal of the plaintiffs' case

---

[8] The Sixth Circuit acknowledged that the law contained "various safe harbors that preclude *liability* if an enforcement action materializes" (emphasis added), but they did not preclude enforcement actions and the associated costs that the Guild's members would incur. *Online Merchants Guild*, 995 F.3d at 551.

"would leave them in a legal penumbra, uncertain of the legality of their actions and afraid that [the defendant] might enforce its ordinance at any time").

In addition, "standing may be established under [Sixth Circuit] precedent on targeted laws, which holds that even when prosecutors disavow enforcement of a law, plaintiffs may still sufficiently allege standing when the law is specifically targeted at the plaintiffs." *Plunderbund Media*, 753 Fed.Appx. at 371-72. "A number of cases have found it sufficient that suit is brought by the only plaintiff that is subject to regulation by an enactment." 13B *Fed. Prac. & Proc.* § 3532.5 (3d ed.). In *National Rifle Association of America v. Magaw*, 132 F.3d 272, 283 (6th Cir. 1997), the Court reasoned that plaintiffs were "in a special posture with regard to the issue of standing" when they sought to challenge an act that singled out and specifically targeted them. *See also Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1299 (3d Cir. 1996) ("[C]ourts have found sufficient adversity between parties to create a justiciable controversy when suit is brought by the only plaintiff subject to regulation by an enactment."); *People of State of Ill. v. Gen. Elec. Co.*, 683 F.2d 206, 210 (7th Cir. 1982) ("[A]s the Act has only one conceivable target -- the Morris facility -- it is extremely unlikely that the state would overlook the violation."); *St.. Paul Area Chamber of Com.*, 439 F.3d at 485 (8th Cir. 2006) ("When a statute is challenged by a party who is a target or object of the statute's prohibitions, there is ordinarily little question that the statute has caused him injury.") (internal quotation omitted). Because Plaintiffs are the very targets of the non-disparagement clause, there is a substantial risk of enforcement against them.

We reiterate that "individuals or groups need not wait to be prosecuted for the exercise of First Amendment rights before they can bring a lawsuit, provided there is a 'claim of specific present objective harm or a threat of specific future harm.'" *Jones v. Coleman*, 848 F.3d 744, 749 (6th Cir. 2017) (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). "A threat is credible, in this context, if a person must censor herself to avoid violating the law in question." *Miller*, 852 F.3d at 506; *see also Platt*, 769 F.3d at 452 ("Platt thus must censor himself to avoid violating the Code, which amounts to a credible fear of enforcement.") (quotation omitted). That is precisely what Plaintiffs have done in response to the Board's adoption of the non-disparagement clause and the threat of its enforcement. In summary, Plaintiffs are specifically targeted by the non-disparagement clause, and their fear of its enforcement is credible, not imaginary or wholly speculative. They have established a factual, non-conjectural basis for their fear of enforcement. Thus, the second requirement for a pre-enforcement challenge is met.

Aside from the pre-enforcement analysis, we note that Metro raises a separate argument as to why Plaintiffs should lack standing in this case. Metro argues that Plaintiffs lack standing to pursue a challenge to the Severance Agreement because they are not parties to the contract. Metro relies on cases involving contract law stating that persons who are not parties to a contract or third-party beneficiaries thereof lack standing to enforce the contract or challenge its validity. *See, e.g.*, *Slorp v. Lerner, Sampson & Rothfuss*, 587 F.

Appx. 249, 254-55 (6th Cir. 2014). As this Court recently noted, "'Where [parties] do not have a right to enforce the contract themselves, and where they are not third party beneficiaries to the contract, no standing exists under the Declaratory Judgment Act to bring an action to determine the rights *of the parties under the contract*." *Elvis Presley Enterprises, Inc. v. City of Memphis*, No. W2019-00299-COA-R3-CV, 2022 WL 854860, at *12 (Tenn. Ct. App. Mar. 23, 2022) (quoting *Farmers Ins. Co. v. Miller*, 926 S.W.2d 104, 107 (Mo. Ct. App. 1996)) (emphasis added). The difference here is that this contract expressly states that the non-disparagement clause is "binding upon each Board member individually." As such, this is not a case where a third-party who is not a party to the contract is seeking a declaration of the rights of *other parties to* the contract. This case involves an effort to challenge a contract that expressly states that it is binding upon non-parties, and those non-parties are attempting to have *their own rights* determined. Therefore, the caselaw cited by Metro is not controlling. *See Oeschger v. GeneThera, Inc.*, 395 F. Supp. 3d 345, 352-53 (D. Vt. 2019) (acknowledging that nonparties to contracts generally lack standing to seek a declaration of rights under a contract but concluding that the case before it was different because the plaintiff sought a declaratory judgment that he had no liability under the agreement on the basis that he was not bound by it in the first place); *Leevers v. Bilberry*, No. 4:04-CV-34 (CDL), 2007 WL 315344, at *3-4 (M.D. Ga. Jan. 31, 2007) (finding standing where a party sought declaratory and injunctive relief that it was not required to arbitrate because it was not a signatory to the arbitration agreement and was made a party to arbitration without its consent). Moreover, this was more than a mere contract among private parties that purported to bind Plaintiffs; it was approved by a resolution of the Board.

Finally, Metro argues that Plaintiffs lacked standing because "[i]t goes without saying that a contract cannot bind a nonparty," and therefore, Plaintiffs "could never have been bound" by the Severance Agreement *legally*, and it could not *lawfully* have been binding or enforced against them regardless of the language to the contrary in the contract itself. Metro suggests that the obvious invalidity of the language in the contract under "basic contract principles" renders "untenable" any argument that the contract could have *lawfully* been enforced in order to censor Plaintiffs' speech, prevent them from communicating, or ultimately "infringe upon their First Amendment rights." Metro also argues that the obvious unenforceability of the contract defeats the redressability element of standing because the requested declaratory and injunctive relief "can therefore not accomplish anything" if the contract is already unenforceable under contract law.

We do not agree that this argument defeats Plaintiffs' standing to bring this lawsuit challenging the Severance Agreement. This is essentially one of the alternative *merits* arguments regarding enforceability that Plaintiffs advanced during the course of this litigation, and at the same time, Metro appears to question the *merits* or ultimate success of Plaintiffs' First Amendment claim. However, standing focuses on "a party's right to bring a cause of action, and the likelihood of success on the merits does not factor into such an inquiry.'" *Fisher*, 604 S.W.3d at 396; *see, e.g.*, *Parsley v. City of Manchester*, No.

- 23 -

M2021-00200-COA-R3-CV, 2021 WL 6139210, at *4 (Tenn. Ct. App. Dec. 29, 2021) (explaining that a trial court "put the cart before the horse" by ruling that the plaintiff did not have standing on the basis that the city charter language did not entitle him to a position, as "an ultimate decision adverse to a plaintiff on the merits of the case does not deprive the party of standing to bring the action"). "[T]he party seeking a declaratory judgment is not required to allege facts in its complaint demonstrating that it is entitled to a favorable decision." *Blackwell v. Haslam*, No. M2011-00588-COA-R3-CV, 2012 WL 113655, at *8 (Tenn. Ct. App. Jan. 11, 2012). "[T]he fact that the party seeking declaratory relief is not entitled to a favorable judgment—that he, she, or it will not prevail on the issue in controversy—does not mean that the parties are not entitled to the 'relief from uncertainty that a declaratory judgment affords.'" *Id*. at *7. The same should hold true when a party *is* entitled to a favorable judgment. "[T]he likelihood of success on the merits does not factor into such an inquiry." *Fisher*, 604 S.W.3d at 396. The fact that the defendants admit in their briefs that their contract was unlawful should not prevent Plaintiffs from having standing to challenge the contract in court.

For purposes of standing, "what is essential is that the party seeking the declaratory judgment state facts sufficient to demonstrate the existence of an actual controversy concerning the matter at issue in the declaratory judgment action." *Blackwell*, 2012 WL 113655, at *8. "The prevailing rule is that when a party seeking a declaratory judgment alleges facts demonstrating the existence of an actual controversy concerning a matter covered by the declaratory judgment statute, the court should not grant a [Rule] 12.02(6) motion to dismiss but, instead, proceed to render a declaratory judgment as the facts and law require." *Cannon Cty. Bd. of Educ. v. Wade*, 178 S.W.3d 725, 730 (Tenn. Ct. App. 2005). The general purpose of a declaratory judgment action is to resolve disputes and afford relief from uncertainty with respect to rights, status, and other legal relations. *Id*. We express no opinion as to the merits of Plaintiffs' claims in our analysis of standing. However, we conclude that Plaintiffs demonstrated a sufficient controversy for standing to exist by establishing that the Board and Dr. Joseph have attempted or purported to bind them to an existing legislatively-approved contract and to create contractual liability in the event that Plaintiffs violate the terms of that contract. Plaintiffs' alleged injury is also redressable because the requested relief *can* accomplish something – it can declare that the non-disparagement clause is in fact unenforceable and unconstitutional and enjoin its enforcement.[9]

---

[9] Metro compares this case to *California v. Texas*, 141 S. Ct. 2104, 2112 (2021), which involved a challenge to the Patient Protection and Affordable Care Act, requiring most Americans to obtain minimum health insurance coverage, when Congress had already amended the Act and "effectively nullified the penalty" for individuals who failed to do so by reducing it to $0. The individual plaintiffs claimed "particularized" harm in the form of their payments to carry the coverage, claiming that the statutory language "commands them to buy health insurance." *Id.* at 2113-14. Assuming that this would meet the injury element of standing, the Court nevertheless found that it would not meet the second element – traceability. *Id.* at 2114. The Court explained,

- 24 -

We note that Dr. Joseph also raises a separate argument regarding the third element of standing – redressability, which means "the injury must be capable of being redressed by a favorable decision of the court." *Fisher*, 604 S.W.3d at 396. Dr. Joseph argues that invalidating and enjoining the enforcement of the non-disparagement clause would not "insulate Plaintiffs from suit" because he can still protect his reputation through a defamation claim. Thus, he claims that their injury, "a fear of future litigation," cannot be prevented by declaratory relief in this case. We are not persuaded by this argument. As Dr. Joseph acknowledges in his brief, a defamation claim would be based on statements that were false. The non-disparagement clause bars Plaintiffs from even truthful criticism of Dr. Joseph and suggests that he could bring a contract-based claim against Plaintiffs and seek damages in the event that they "violate[] the terms and conditions [of] this Article of the agreement." This is Plaintiffs' alleged injury, and it is "capable of being redressed by a favorable decision of the court." *Id*.

For all of these reasons, we conclude that Plaintiffs have standing to assert their pre-enforcement challenge, and their claims are sufficiently ripe.

---

> Their problem lies in the fact that the statutory provision, while it tells them to obtain that coverage, has no means of enforcement. With the penalty zeroed out, the IRS can no longer seek a penalty from those who fail to comply. . . . Because of this, there is no possible Government action that is causally connected to the plaintiffs' injury—the costs of purchasing health insurance. Or to put the matter conversely, that injury is not "fairly traceable" to any "allegedly unlawful conduct" of which the plaintiffs complain. *Allen v. Wright*, 468 U.S. [at 751]. . . .
>
> The plaintiffs point to cases concerning the Act that they believe support their standing. But all of those cases concerned the Act when the provision was indisputably *enforceable*, because the penalty provision was still in effect. . . . These cases therefore tell us nothing about how the statute is enforced, or could be enforced, today.

*Id.* The Court noted that its cases had "consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened *enforcement*, whether today or in the future." *Id.* "Here," the Court explained, "there is no action—actual or threatened—whatsoever. There is only the statute's textually unenforceable language." *Id.* at 2115. The Court said that the third element of standing – redressability – also made clear that "the statutory language alone is not sufficient." *Id.* The plaintiffs did not seek injunctive relief regarding the provision they alleged was unconstitutional; they only sought declaratory relief. *Id.* The Court added, "How could they have sought any such injunction? The provision is unenforceable. There is no one, and nothing, to enjoin." *Id.* at 2116. "To find standing here to attack an unenforceable statutory provision would allow a federal court to issue what would amount to an advisory opinion without the possibility of any judicial relief." *Id.*

Metro argues that Plaintiffs have likewise failed to meet the element of redressability because the non-disparagement clause is unenforceable "under basic contract principles," so any decision in this case would amount to an advisory opinion. However, this situation is unlike the one at issue in *California v. Texas*, where Congress had already amended the Act, leaving only "textually unenforceable language." The non-disparagement clause remained undisturbed in the legislatively-approved Severance Agreement, and it had not been declared or otherwise rendered unenforceable. That is the judicial relief sought by Plaintiffs, in addition to an injunction prohibiting its enforcement. Therefore, the element of redressability was met here.

### C. PEPFA

Metro argues on appeal that Plaintiffs' complaint "fails to state a claim under PEPFA" because "[i]n order to impose liability under PEPFA," discriminatory action must have been taken by the public employer as a result of the public employee's communication. *See* Tenn. Code Ann. § 8-50-603(b) ("If the court of competent jurisdiction determines that a public employer has disciplined, threatened to discipline or otherwise discriminated against an employee because such employee exercised the rights provided by this part, such employee shall be entitled to compensatory damages plus reasonable attorney fees."). Metro argues that Plaintiffs failed to allege any discriminatory action resulting from communication, so "the PEPFA claim" should be dismissed. However, as the trial court rightly noted, the defendants have continued to address the PEPFA issue as if Plaintiffs were asserting a claim for "liability" in the form of a cause of action for damages. Plaintiffs made clear that they were only asserting that the non-disparagement clause violated public policy expressed in the PEPFA, and therefore, the non-disparagement clause should be declared void. As a result, we need not consider Metro's argument that the allegations failed to "state a claim under PEPFA." Metro does not argue that the non-disparagement clause did not violate public policy. Even if it did, it would not be necessary to consider the issue on appeal due to the numerous alternative grounds upon which the trial court relied in declaring the non-disparagement clause unenforceable and unconstitutional, which the defendants have not appealed. *See Lovelace v. Baptist Mem'l Hosp.-Memphis*, No. W2019-00453-COA-R3-CV, 2020 WL 260295, at *3 (Tenn. Ct. App. Jan. 16, 2020) (explaining that when a trial court provides more than one basis for its ruling, the appellant generally must appeal all of the alternative grounds for the ruling, and if a separate and independent ground supports the judgment made below and is not challenged on appeal, the appellate court must affirm).

### D. The Trial Court's Award of Attorney Fees

We now consider Plaintiffs' argument that this Court does not have subject matter jurisdiction to consider any issue regarding the trial court's award of attorney fees due to the timing and content of the defendants' notices of appeal. The notices of appeal were filed prematurely, after the entry of the order declaring the non-disparagement clause unenforceable and unconstitutional, but prior to the final award of attorney fees. This Court entered an order stating that the notices of appeal would be deemed premature and would be treated as filed as of the date of the final judgment. However, Plaintiffs argue that the notices of appeal did not (and could not) state that the defendants desired to appeal from the final order on attorney fees, so the subsequent final order is "unappealed" and "not within the Court's subject matter jurisdiction." Plaintiffs rely on *Howse v. Campbell*, No. M1999-01580-COA-R3-CV, 2001 WL 459106, at *3 (Tenn. Ct. App. May 2, 2001), in which this Court held that a premature notice of appeal filed after an order dismissing one defendant did not perfect his appeal with respect to other defendants who were dismissed

over a year later. We explained that the appellant's failure to file a second notice "undermined the notice function that notices of appeal are intended to serve." *Id.* However, we noted,

> The facts of this case differ from the more common circumstance giving rise to a premature notice of appeal. Premature notices of appeal generally occur when a plaintiff attempts to appeal from the dismissal of one, but not all, of its claims against a single defendant. This notice is premature because the trial court has not yet adjudicated all the claims between the parties. However, the premature notice of appeal clearly puts the defendant on notice that the plaintiff intends to seek appellate review. *This case involves multiple parties.* The filing of a premature notice of appeal from the dismissal of the plaintiff's claims against one of the parties does not necessarily put the remaining defendants on notice that the plaintiff will choose to appeal from the later dismissal of its claims against them.

*Id.* at *3 n.6 (emphasis added). Here, the facts fall within the "more common circumstance" discussed in *Howse*, involving a premature notice of appeal following the adjudication of "one, but not all," of the pending claims. It did not involve defendants dismissed at different times. Therefore, this case is distinguishable from *Howse*.

This Court considered a situation more similar to ours in *Consolidated Waste Systems, LLC v. Metro. Government of Nashville and Davidson County.*, No. M2002-02582-COA-R3-CV, 2005 WL 1541860 (Tenn. Ct. App. June 30, 2005). In that case, an appellee argued that an appellant was precluded from raising issues regarding attorney fees when the notice of appeal stated that the appellant was appealing from a "final judgment entered on the 6th day of August 2002" and did not mention the order awarding attorney fees entered in October. *Id.* at *42. Although Tennessee Rule of Appellate Procedure 3(f) provides that a notice of appeal "shall designate the judgment from which relief is sought," we pointed out its Advisory Commission Comment, which states:

> This subdivision specifies the content of the notice of appeal. The purpose of the notice of appeal is simply to declare in a formal way an intention to appeal. As long as this purpose is met, it is irrelevant that the paper filed is deficient in some other respect. Similarly, the notice of appeal plays no part in defining the scope of appellate review. Scope of review is treated in Rule 13. This subdivision read in conjunction with Rule 13(a) permits any question of law to be brought up for review [except as otherwise provided in Rule 3(e)] as long as any party formally declares an intention to appeal in a timely fashion.

*Id.* at *42-43. We also discussed Rule 13(a), which provides that "any question of law may be brought up for review and relief by any party," and its Advisory Commission Comment

- 27 -

stating that the rule "rejects use of the notice of appeal as a review-limiting device." *Id.* at *42. At that time, Tennessee courts had considered the consequence of an appellant's failure to specify a particular order as the basis of the appeal a number of times but with "differing treatment, depending on the circumstances." *Id.* In some cases, this Court had held that "when a specific judgment or order is designated in the notice of appeal, Tenn. R. App. P. 3(f) limits the scope of appellate review to the judgment or order designated." *Id.* at *44 (citing *Goad v. Pasipanodya*, No. 01A01-9509-CV-00426, 1997 WL 749462, at *2 (Tenn. Ct. App. Dec. 5, 1997) *relying on Hall v. Hall*, 772 S.W.2d 432 (Tenn. Ct. App. 1989)). We also noted the *Howse* decision. *Id.* Ultimately, we acknowledged the argument that under the "*Hall*, *Goad*, and *Howse*" line of cases, "this court's review would be limited to the appellant's designation" and would not extend to the subsequent order on attorney fees. *Id.* at *45. However, we also noted that the situation before us did not involve any complicating factors such as multiple defendants or untimeliness, like some of the other cases. *Id.* We conceded that the notice of appeal could reasonably be interpreted either way, indicating an intention to appeal only the first order or the award of attorney fees as well. *Id.* Given the "varying interpretations" of Rule 3(f), "the clear preference [] for liberality in interpreting a notice of appeal and the scope of appeal," and the lack of prejudice to the appellee from the failure to specifically designate the order on attorney fees, we concluded "the better view is that the [appellant] can raise any issue resulting from the trial court's final judgment." *Id.*

Since the decision in *Consolidated Waste*, this Court has noted the differing approaches to this issue numerous times. *See, e.g.*, *In re NHC--Nashville Fire Litig.*, 293 S.W.3d 547, 557-58 (Tenn. Ct. App. 2008) ("Citing the language in Rule 3(f), this Court has at times refused to consider issues raised on appeal that were resolved in an order other than the one specified in the notice of appeal. . . . In other cases, the appellate court has focused on whether the "notice function" of Rule 3(f) has been served, to determine whether the scope of review must be limited to the order designated in the notice of appeal."); *Thompson v. Logan*, No. M2005-02379-COA-R3-CV, 2007 WL 2405130, at *12 (Tenn. Ct. App. Aug. 23, 2007) ("Most of the cases use language indicating either a strict application of Rule 3(f) or else an approach declining to use that rule as an issue-limiting device and concentrating instead on the purpose of the notice of appeal."). We have repeatedly taken the approach from *Consolidated Waste*. *See In re Caleb F.*, No. M2016-01584-COA-R3-JV, 2017 WL 5712992, at *4 (Tenn. Ct. App. Nov. 28, 2017) ("The notice of appeal is not a review-limiting device.") (quotation omitted); *Ray v. Ray*, No. M2013-01828-COA-R3-CV, 2014 WL 5481122, at *10 n.9 (Tenn. Ct. App. Oct. 28, 2014) (explaining that the notice of appeal "plays no part in defining the scope of appellate review" and "is not a review-limiting device" so when "any party files a notice of appeal the appellate court may consider the case as a whole") (quotations omitted); *McKissack ex rel. McKissack v. Davidson Transit Org.*, No. M2013-01224-COA-R3-CV, 2014 WL 575912, at *2 n.3 (Tenn. Ct. App. Feb. 11, 2014) ("While we are aware of the various cases interpreting Tenn. R. App. P. 3(f), we decline to put narrow limits on the scope of appeal in this case."); *Cox v. Tenn. Farmers Mut. Ins. Co.*, 297 S.W.3d 237, 243 (Tenn. Ct. App.

2009) (rejecting the argument that Rule 3(f) should be narrowly construed); *Elliot v. Life of the S. Ins. Co.*, 296 S.W.3d 64, 68 (Tenn. Ct. App. 2008) ("Although Ms. Elliot appealed the order denying her motion to alter or vacate the orders for summary judgment, our review is not limited to only that order as it is well settled that the notice of appeal is not a review limiting device, and we may consider any question presented[.]"); *In re NHC--Nashville Fire Litig.*, 293 S.W.3d at 560 ("We accord great deference to the advisory commission comments to the effect that Rule 3(f) is not intended to limit the scope of review so long as the notice of appeal informs the appellee that the appellant intends to seek further review of the trial court's judgment.").

Plaintiffs' brief on appeal relies on the *Howse-Hall* line of cases. We will instead apply the approach taken in *Consolidated Waste* and its progeny. Here, the initial order declaring the non-disparagement clause unenforceable and unconstitutional also included the trial court's ruling that "Plaintiffs are entitled to recover their reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988," and it directed Plaintiffs to submit their applications for fees by a certain deadline. Although the defendants filed their notices of appeal before the final awards were determined, the premature notices of appeal served their purpose of sufficiently informing Plaintiffs that the defendants intended to seek further review of the trial court's judgment. Thus, we reject Plaintiffs' argument that this Court lacks subject matter jurisdiction to reach any issue regarding attorney fees.

We now turn to the substance of the arguments presented on appeal regarding attorney fees. Metro's brief on appeal did not raise any issue regarding the trial court's award of attorney fees. However, it did state in a footnote that Metro adopted by reference and joined Dr. Joseph's brief. Dr. Joseph's brief contains one issue regarding attorney fees: "Whether qualified immunity should be extended to a former government employee in a suit initiated by his former employers to effectuate the policy rationale underpinning the doctrine of qualified immunity." Dr. Joseph argues that "ordering [him] to pay attorney fees erodes public policy rationale underpinning the doctrine of qualified immunity and good faith defenses." Plaintiffs contend that this issue should be deemed waived because it was raised for the first time on appeal. We agree. "[I]ssues not raised in the trial court cannot be raised for the first time on appeal." *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 898 (Tenn. 2016).

### E.    *Attorney Fees on Appeal*

Plaintiffs argue that because they prevailed on their federal constitutional claims in the trial court, they should also be awarded attorney fees on appeal in the event that they prevail. We conclude that Plaintiffs qualify as prevailing parties within the meaning of 42 U.S.C. § 1988 and are entitled to an award of reasonable attorney's fees incurred on appeal related to their constitutional claims. *See Murrell v. Bd. of Admin. City of Memphis Pension & Ret. Sys.*, No. W2020-00187-COA-R3-CV, 2021 WL 1233500, at *5 (Tenn. Ct. App. Mar. 31, 2021) *perm. app. denied* (Tenn. Sept. 22, 2021). The trial court must determine

- 29 -

a reasonable amount of fees on remand. *See id.*

## IV.   CONCLUSION

For the aforementioned reasons, the decision of the chancery court is affirmed and remanded.   All other issues are pretermitted.   Costs of this appeal are taxed to the appellants, Shawn Joseph and Metropolitan Government of Nashville & Davidson Co., Metropolitan Nashville Board of Public Education, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE